Casey, Ch. J.,
delivered the opinion of the court:
Many difficult and abstruse questions, both of international and", municipal law, have been started and discussed by the counsel in these cases. Most of them relate to the right and policy of seizing and con- ■ fiscating the private property of enemies on land. Addressed to the war-making and war-conducting departments of the government, they would be worthy of great consideration. And we must presume that,. in the performance of their high functions during the recent rebellion,. the legislative and executive authorities of the United States were guided and controlled by clear, just, and intelligent views of this whole ■ subject. It was their duty and province to pass upon these questions,'. and we have neither the right nor the inclination to review their action. in the premises.
The enactments under which we have cognizance of these cases are very plain and simple. They confer very special and limited powers.. Being a statutory court, we have only such jurisdiction as is expressly conferred by Congress, or necessarily implied from the terms- they, have used.
In regard to the seizure of the enemy’s private property on land,. Congress, by a series of enactments pending the recent rebellion,have so distinctly specified the property subject to capture and confiscation, that nothing scarcely is left for judicial construction. Their right and constitutional power to do so cannot be even plausibly controverted.
The acts of the 13th July, 1861, and 17th July, 1862, point out. the property .which, from its predicament and the disposition and conduct of its owner, shall be liable to seizure and forfeiture. All that remains after this designation is to determine, as matter of fact, whether the property and the owners of it are of the character denounced by the enactments referred to.
*530 To determine these facts the act of July 17,1862, provided that the property after being seized should be libelled in some court of the United States; that the proceedings thereupon should conform as nearly as circumstances would permit to the practice of courts of admiralty in maritime prize cases, or to that of the law side in proceedings to recover fines and forfeitures under the revenue laws. In such proceedings, if the property was proved to have been in any of the predicaments interdicted by the acts of Congress, or the owner of such property to have been guilty of any of the disloyal and treasonable conduct specified in those acts, it was condemned, and thereupon absolutely forfeited to the United States. The President, through the military forces, was charged with the execution and enforcement of the law. Experience proved that it was very difficult, if not entirely impossible, under the circumstances, to carry out these provisions in a manner to do justice either to the owners or the United States. Pending the war, amid the conflict of arms, it was hard to discriminate between the different residents of the rebel territory, as to their sentiments or conduct, by officers of the United States, who in most cases were entire strangers to the persons and the vicinity. The owners could not always ascertain where their property had been taken for judicial proceedings. They could rarely have notice of their pendency, and when they had, it was not often that they could either come through the military lines themselves, or bring the necessary witnesses and proofs before the court, to establish the innocence of themselves or their property. Some property, of course, was seized that was not liable to forfeiture or confiscation, by reason of it having belonged to persons who had maintained their faith and allegiance to the United States. It was deemed a hardship to condemn and forfeit the prop- . erty of such; and it was, moreover, contrary to the whole policy and intention of Congress as manifested in these enactments. The care and management of this property seriously interfered with the military duties of the officers of the army, and was calculated to introduce demorali-zation and corruption. Influenced by such views, and with a design ■ to remedy the defects in the laws of 1861 and 1862, Congress passed the act of March 12, 1863. This latter act had three special objects •in view, viz-: 1st. To relieve army officers from the duty of handling and selling this captured and abandoned property, and to transfer those duties to civilians under the Treasury Department, as part of the revenue system. 2d. To enable a sale of the property to be made without any previous judicial order or decree of condemnation. 3d. To substitute .thee net proceeds for the property, and the Court of Claims *531 for the prize courts, giving tbe parties day in court after the suppression of the rebellion, when they could appear with their proofs.
Congress has decided all the questions debated with such consummate ability before us, for themselves, for the country, and for us. We think they have decided them justly and wisely. It would not matter if we even thought otherwise. We could not change their decision if we would, and would not if we could. They foresaw that the capture of the property of many Union men residing in the seceded States was inevitable. It would necessarily result from any earnest, faithful effort to enforce the law against rebels. While it would be impossible in all instances to avoid the seizure of the property of loyal citizens so circumstanced, great care and pains were taken to provide a method of repairing the injury done to them. The remedy devised is provided by the 3d section of the act of March 12, 1863, as follows :
“ Sec. 3. And be it further enacted, That the Secretary of the Treasury may require the special agents appointed under this act to give a bond, with such securities and in such amount as he shall deem necessary, and to require the increase of said amount and the strengthening of said security, as circumstances may demand; and he shall also cause a book or books of accounts to be kept, showing from whom such property was received, the cost of transportation, and proceeds of the sale thereof. And any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court ,pf his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase-money which- may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.”
The entire power of this court over this property or its proceeds., and all its duties in reference to the same, are conferred and prescribed by this act. An attentive reading of the section will show that Congress intended the inquiry to be a circumscribed and narrow one. They had definitively decided two things : first, that the property of persistent and incorrigible rebels should be seized and sold, and the proceeds paid into the treasury of the United States; second, that where the property of a true and faithful Union citizen should be seized and sold by mistake, the proceeds should be refunded to him. The first point was carried out by the seizure and sale, and payment *532 into the treasury of the proceeds. No power but Congress can rightfully take them thence. The second, being simply questions of fact, are referred to this court for decision. We are to decide three things : first, that the claimant was the owner of the property seized and sold ; second, that he is entitled to the proceeds; third, that he has never given any aid or comfort to the recent rebellion. If he prove these things, the law says expressly “ he shall receive the residue of such proceeds,” after the deduction of the lawful expenses attending its disposition and sale. If he fail in his proof, the proceeds remain in the treasury, to the use of the United States.
The act says that he shall prove these things “ to the satisfaction of the said court.” This we hold to mean, that the facts shall he established by legal and competent testimony, in the same manner that is usually practiced in courts of justice; that such testimony shall be taken before a competent officer or magistrate, on legal notice to the solicitor for the United States, under the solemnity of an oath, and subject to a cross-examination under such rules as the court has prescribed. The evidence of ownership of the property required is at least equal to that necessary to sustain an action of trespass or trover. The ownership must he a bona fide one, not collusive or colorable. The claimant seeking to recover the proceeds must show not only that he purchased the property, but he must satisfy us that he did so in the regular course of his business and not in fraud of the act, or with a view of speculating upon the justice of the government. We hold that wherever one individual has sold and the other purchased to prevent the property from being seized by and forfeited to the United States, the ownership is not genuine. Such a elaim is collusive and a fraud upon the law, and does not prove satisfactorily the genuine, bona fide ownership contemplated by the act of 12fch March, 1S63.
2. Wherever the ownership is undoubted, and no assignment or transfer appears, and no counter-claim is interposed, we infer that such owner is entitled to the proceeds, if not otherwise debarred from receiving them. Where there is a dispute between different claimants as to their right to the proceeds, we allow them to interplead, and hold that question in abeyance until the others are settled.
3. Upon the question of loyalty the act is rigid and strict; and we feel no disposition to relax its requirements. It puts upon the claimant, so far as it can he done, the difficult task of proving affirmatively a negative proposition, viz., that “ he has never given any aid or comfort to the rebellion.”
*533 We do not believe that the only “ aid or comfort ” which will prevent a recovery are such acts as would under the Constitution and laws constitute treason. The act of July 17, 1862, puts these and nearly similar words in juxtaposition with others which explain how they were used criminally and how in reference to property. In the second section it prescribes the punishment for inciting to or engaging in the rebellion as a different offence from that of treason, which was provided for in the first section. If any person shall “ incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States, or the laws thereof, or shall give aid or comfort thereto, or shall engage in or give aid and, comfort to any such existing rebellion or insurrection,” &c. In the sixth clause of the fifth section it provides, in reference to this same subject — the forfeiture of property — as follows: “ If any person who, owning property in any loyal State or Territory, &c., shall hereafter assist and give aid and comfort to such rebellion,” such property shall be subject to seizure and forfeiture. The sixth section further provides that if any person other than those previously named, “ being engaged in armed rebellion against the government of the United States, or aiding or abetting such rebellion,” shall not, after proclamation by the President, “ cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States,” all his property should be liable to seizure and forfeiture.
The seventh section of the same act made provision for libelling such property so seized in various courts of the United. States, and after directing that the proceedings should conform as nearly as may he to proceedings in admiralty or revenue cases, it enacts, “And if said property, whether real or personal, shall be found to have belonged to a person engaged in rebellion, or who has given aid or comfort thereto, the same shall be condemned as enemies’ property, and become the property of the United States,” &c.
Other provisions of this act might be cited to show that these words have been used by Congress, in relation to property, and in a different sense from that in which the same, or nearly identical, words are used in the Constitution and laws of the United States to define the crime of treason and prescribe its punishment. Any acts voluntarily committed which would tend to assist, countenance, abet, or encourage the rebellion, are a flat bar to a claimant’s recovery under this law. And to entitle the claimant to recover, the act requires that he should prove, by those who had the opportunities of observ *534 ing his conduct, that he did not give such assistance or encouragement to the insurrection. He must go further. His evidence to that effect must cover the entire period of the war, so that it shall appear that he “never” gave any aid or comfort to the rebellion.
On the other hand, we do not think that a mere residence in the rebel territory, and an unwilling submission to the usurping government, will bar a recovery. Where the great body of the inhabitants of a section or district rebel against the constituted authorities, individuals are not required to resist where such resistance would be futile and unavailing. It would be merely to invoke destruction upon themselves, without any correspondent benefit to their country. When a loyal resident or citizen of the insurgent territory pays the taxes which the usurping government assesses upon him, and the contributions it levies, he does so because the demand comes backed by a power and force which he cannot withstand, and which it would be madness and folly to resist.
The Supreme Court of the United States, in Mrs. Alexander’s cotton, 2 Wallace, 422-3, clearly indicates that the act was intended to apply to Union people in the seceded States. There are doubtless many such, whom it would be cruel injustice to exclude from its benefits. Numbers of them suffered all that malignity could inflict, or human nature could endure, because of their devotion and allegiance to their country. The wisdom and justice of the policy that would seize their property and refuse, upon full proof of their loyalty, to return the remnant of the proceeds, would be open to serious dispute. But nothing of the kind was ever intended by Congress. We are entirely confident that we best fulfil their just intentions -in framing and passing what Mr. Chief Justice Chase styles “ a beneficent statute,” when we restore to men of undoubted and unquestioned loyalty to the country the proceeds of the property which was wrested from them through the mistakes or inadvertence of the public agents.
In all cases in which the requisite facts have been proved to our satisfaction we shall certify those facts to the Treasury Department, without any special opinion in such case; and, in accordance with the views here expressed, we have directed the following cases to be certified for the respective amounts stated and found due to the several claimants.
*535 MARGARET BOND V. The United States.
And now, to wit, June 25, 1867, tbis cause came on to be tried by the said court before the judges thereof; and said court baying beard the parties by their respective solicitors and counsel, and having^ beard their respective proofs and allegations, it is now considered by the court here, that the said Margaret Bond has proved to the satisfaction of the said court, that she was the bona fide. owner of fifteen bales of cotton mentioned and described in her petition filed in tbis case; and that the same cotton was seized and captured on or about the -
day of May, 1865, at Mobile, in the State of Alabama, by the officers and agents of the United States; that the same was sold in the manner provided by law, and the proceeds of the said sale, after deducting all lawful expenses attending the disposition of the same, were paid over into the treasury of the United States, where the same now remain, amounting to the sum of two thousand eight hundred and twenty-three dollars and seventy-five cents, ($2,823 75.) And it was at the same time further considered by the said court, that the said Margaret Bond had proved to the satisfaction of said court, that she, the said Margaret Bond, had never given aid or comfort to the recent rebellion waged against the United States; and that she, the said Margaret Bond, is legally entitled to the said net proceeds of said cotton as aforesaid, to the amount aforesaid, according to the tenor and effect of the several acts of Congress in such case made and provided, and the same are accordingly awarded to her, the said Margaret Bond.
It is further considered that this finding be certified by the clerk of this court, under the seal thereof, to the Secretary of the Treasury of the United States, for payment of the amount therein contained and found due to the said claimant.
By the Court :
A similar decree, for the respective amounts stated, was entered in each of the following cases :
Celestine Eslava v. the United States, for the sum of. 126,543 25
Bobt. H. McCroskey.do.do. 5, 404 05
Wm. Markham.do.-.do. 3, 602 70
John Silvey.do.do. 14, 050 53
*536 Joseph Mertens v. The United States for the sum of $3, 767 68
John. Deighen.. — .... do.do. 2, 960 32
Joshua D. Giddings.do.do. 1,111 04
Joseph Purcell.do.do. 18,703 Samuel G. Courteney.do.do. 3, 767 Patrick J. Coogan.do.do. 16,820 64 68 00
John W. Oarmalt.do.do. 8,751 62
Patrick Moran.do.do. 10, 630 24
Geo. J. Cunningham.do.do. 1, 514 08