# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 16, 2009          Decided June 8, 2010

No. 07-5174

EL-SHIFA PHARMACEUTICAL INDUSTRIES COMPANY AND
SALAH EL DIN AHMED MOHAMMED IDRIS,
APPELLANTS

v.

UNITED STATES OF AMERICA,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00731)

———

*Christian G. Vergonis* argued the cause for appellants. With him on the briefs were *Stephen J. Brogan*, *Timothy J. Finn*, and *Katherine E. Stern*.

*Beth S. Brinkmann*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Mark B. Stern* and *Dana J. Martin*, Attorneys.

Before: SENTELLE, *Chief Judge*, and GINSBURG, HENDERSON, ROGERS, TATEL, GARLAND, BROWN, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Opinion concurring in the judgment filed by *Circuit Judge* GINSBURG, with whom *Circuit Judge* ROGERS joins.

Opinion concurring in the judgment filed by *Circuit Judge* KAVANAUGH, with whom *Chief Judge* SENTELLE joins, and with whom *Circuit Judges* GINSBURG and ROGERS join as to Part I.

GRIFFITH, *Circuit Judge*: The owners of a Sudanese pharmaceutical plant sued the United States for unjustifiably destroying the plant, failing to compensate them for its destruction, and defaming them by asserting they had ties to Osama bin Laden. The district court dismissed their complaint. A panel of this court affirmed, holding that the political question doctrine barred the plaintiffs' claims. After granting rehearing *en banc*, we now affirm the district court on the same ground.

## I.

On August 7, 1998, the terrorist network headed by Osama bin Laden bombed United States embassies in Kenya and Tanzania. Hundreds were killed and thousands injured. On August 20, the United States responded by launching nearly simultaneous missile strikes against two targets: a terrorist training camp in Afghanistan and a factory in Sudan believed to be "associated with the bin Ladin network" and "involved in the production of materials for chemical weapons." President William J. Clinton, Address to the Nation on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 PUB. PAPERS 1460, 1461 (Aug. 20, 1998) [hereinafter Address to the Nation].

President Clinton addressed the American people, explaining "the objective of this action and why it was necessary." *Id.* at 1460. "Our target was terror; our mission was clear: to strike at the network of radical groups affiliated with and funded by Usama bin Ladin, perhaps the preeminent organizer and financier of international terrorism in the world today." *Id.* "The risks from inaction, to America and the world, would be far greater than action," the President proclaimed, "for that would embolden our enemies, leaving their ability and their willingness to strike us intact." *Id.* at 1461.

In a letter to the Congress "consistent with the War Powers Resolution," the President reported that the strikes "were a necessary and proportionate response to the imminent threat of further terrorist attacks against U.S. personnel and facilities" and "were intended to prevent and deter additional attacks by a clearly identified terrorist threat." President William J. Clinton, Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 PUB. PAPERS 1464, 1464 (Aug. 21, 1998). The following day, in a radio address to the nation, President Clinton explained his decision to take military action, stating, "Our goals were to disrupt bin Ladin's terrorist network and destroy elements of its infrastructure in Afghanistan and Sudan. And our goal was to destroy, in Sudan, the factory with which bin Ladin's network is associated, which was producing an ingredient essential for nerve gas." President William J. Clinton, The President's Radio Address, 2 PUB. PAPERS 1464, 1465 (Aug. 22, 1998). Citing "compelling evidence that the bin Ladin network was poised to strike at us again" and was seeking to acquire chemical weapons, the President declared that "we simply could not stand idly by." *Id.*

Other government officials elaborated upon the President's justifications for the attack on the plant. On the day of the strike, the Secretary of Defense stated that bin Laden "had some financial interest in contributing to this particular facility." Compl. at 13, *El-Shifa Pharm. Indus. Co. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005) (Civ. No. 01-731). An unnamed "senior intelligence official" asserted at a press briefing, "[W]e know that bin Laden has made financial contributions to the Sudanese Military Industrial Complex[,] of which, we believe, the Shifa pharmaceutical plant is part." *Id.* And on August 23, the National Security Advisor maintained that "Osama bin Laden was providing key financial help for the plant." *Id.*

The plaintiffs in this case are the El-Shifa Pharmaceutical Industries Company (El-Shifa), the owner of the plant, and Salah El Din Ahmed Mohammed Idris (Idris), the principal owner of El-Shifa. They allege that striking the plant was a mistake, that it "was not a chemical weapons facility, was not connected to bin Laden or to terrorism, and was not otherwise a danger to public health and safety." *Id.* at 6. Instead, the plaintiffs contend, the plant was Sudan's largest manufacturer of medicinal products, responsible for producing over half the pharmaceuticals used in Sudan. Because the case comes to us on appeal from a dismissal for lack of subject-matter jurisdiction, we take the plaintiffs' allegations as true. *See Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 572 n.1 (D.C. Cir. 2003).

According to the plaintiffs, within days of the attack, the press debunked the President's assertions that the plant was involved with chemical weapons and associated with bin Laden. Confronted with their error, senior administration and intelligence officials backpedaled, issuing what the plaintiffs characterize as "revised" or "new justifications" for the strike

and conceding that any relationship between bin Laden and the plant was "indirect." Compl. at 17–19. Although the United States attacked the plant without knowing who owned it, officials learned within three days of the strike that Idris was the owner. After that point, "unidentified U.S. government officials" began telling reporters that Idris maintained direct or indirect financial relations with bin Laden, purchased the plant on bin Laden's behalf, acted as a front man or agent for bin Laden in Sudan, and had "ties" to bin Laden. *Id.* at 19–20. The plaintiffs contend that neither the contemporaneous nor post-hoc justifications for the attack were true: "All of the justifications for the attack advanced by the United States were based on false factual premises and were offered with reckless disregard of the truth based upon grossly incomplete research and unreasonable analysis of inconclusive intelligence." *Id.* at 7.

This lawsuit is only one of several actions the plaintiffs pursued to recoup their losses. They also sued the United States in the Court of Federal Claims, seeking $50 million as just compensation under the Takings Clause of the Constitution. The court dismissed the suit on the ground that "the enemy target of military force" has no right to compensation for "the destruction of property designated by the President as enemy war-making property." *El-Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751, 774 (2003). The United States Court of Appeals for the Federal Circuit affirmed, holding that the plaintiffs' takings claim raised a nonjusticiable political question. *See El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1361–70 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005). On the legislative front, one member of the House of Representatives introduced a bill to compensate those who suffered injuries or property damage in the missile strike, *see* H.R. 894, 107th Cong. (2001), and a resolution directing the claims court to

investigate the matter and issue a report to the House, *see* H.R. Res. 81, 107th Cong. (2001) (citing 28 U.S.C. §§ 1492, 2509). Both the bill and the resolution died in committee.

The plaintiffs brought this action in the United States District Court for the District of Columbia after the CIA denied their requests for compensation for the plant's destruction and for a retraction of the allegations that the plaintiffs were involved with terrorism. The plaintiffs sought at least $50 million in damages under the Federal Tort Claims Act, claiming negligence in the government's investigation of the plant's ties to chemical weapons and Osama bin Laden and trespass in its destruction of the plant "without consent or justification." Compl. at 27. Their complaint also included a claim under the law of nations seeking a judicial declaration that the United States violated international law by failing to compensate them for the unjustified destruction of their property. Finally, the plaintiffs claimed that the President and other senior officials defamed them by publishing false statements linking Idris and the plant to bin Laden, international terrorism, or chemical weapons, knowing those statements were false or making them with reckless disregard for their veracity. The plaintiffs sought extraordinary relief: "[a] declaration that claims made by agents of the United States that Mr. Idris or El-Shifa are connected to Osama bin Laden, terrorist groups or the production of chemical weapons are false and defamatory" and "[a]n order requiring the United States to issue a retraction [of those claims] in the form of a press release." *Id.* at 31.

The district court granted the government's motion to dismiss the complaint for lack of subject-matter jurisdiction, *see* FED. R. CIV. P. 12(b)(1), concluding that sovereign immunity barred all of the plaintiffs' claims. *See El-Shifa*, 402 F. Supp. 2d at 270–73. The court also noted that the complaint

"likely present[ed] a nonjusticiable political question." *Id.* at 276. The plaintiffs filed a motion to alter the judgment with respect to their claims for equitable relief, which the district court denied. *See El-Shifa Pharm. Indus. Co. v. United States*, No. 01-731, 2007 WL 950082 (D.D.C. Mar. 28, 2007).

The plaintiffs appealed, challenging only the dismissal of their claims alleging a violation of the law of nations and defamation. The plaintiffs have abandoned any request for monetary relief, but still seek a declaration that the government's failure to compensate them for the destruction of the plant violated customary international law, a declaration that statements government officials made about them were defamatory, and an injunction requiring the government to retract those statements. A divided panel of this court affirmed the district court, holding that these claims are barred by the political question doctrine. *See El-Shifa Pharm. Indus. Co. v. United States*, 559 F.3d 578 (D.C. Cir. 2009). We vacated the panel's judgment and ordered rehearing *en banc*. *See El-Shifa Pharm. Indus. Co. v. United States*, 330 F. App'x 200 (D.C. Cir. 2009).

## II.

"It is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), but some "[q]uestions, in their nature political," are beyond the power of the courts to resolve, *id.* at 170. The political question doctrine is "essentially a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 217 (1962), and "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean*

*Soc'y*, 478 U.S. 221, 230 (1986). *See also United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990) (explaining that the "doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government").

That some governmental actions are beyond the reach of the courts reflects the Constitution's limitation of the "judicial power of the United States" to "cases" or "controversies." U.S. CONST. art. III; *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does."); *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 215 (1974) ("[T]he concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies both the standing and political question doctrines . . . ."). "It is therefore familiar learning that no justiciable 'controversy' exists when parties seek adjudication of a political question." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007).

In the seminal case of *Baker v. Carr*, the Supreme Court explained that a claim presents a political question if it involves:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing

lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. "To find a political question, we need only conclude that one [of these] factor[s] is present, not all." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

Disputes involving foreign relations, such as the one before us, are "quintessential sources of political questions." *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006). Because these cases raise issues that "frequently turn on standards that defy judicial application" or "involve the exercise of a discretion demonstrably committed to the executive or legislature," *Baker*, 369 U.S. at 211, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981). "Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. Even in the context of military action, the courts may sometimes have a role. *See Gilligan v. Morgan*, 413 U.S. 1, 11–12 (1973). Therefore, we must conduct "a discriminating analysis of the particular question posed" in the "specific case" before the court to determine whether the political question doctrine prevents a claim from going forward. *Baker*, 369 U.S. at 211; *see, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 703–04 (D.C. Cir. 2008) (holding the political question doctrine did not bar a challenge to disclosures "identifying a previously covert agent" and therefore "implicat[ing] national security" because the plaintiffs' claims did "not challenge[] any foreign policy

or national security decisions entrusted to the Executive Branch").

In undertaking this discriminating analysis, we note, for example, that the political question doctrine does not bar a claim that the government has violated the Constitution simply because the claim implicates foreign relations. *See I.N.S. v. Chadha*, 462 U.S. 919 (1983) (holding the one-House legislative veto unconstitutional despite its use in matters of foreign affairs and the war powers). Because the judiciary is the "ultimate interpreter of the Constitution," *Baker*, 369 U.S. at 211, in most instances claims alleging its violation will rightly be heard by the courts. *See, e.g.*, *Chadha*, 462 U.S. at 941–42 ("No policy underlying the political question doctrine suggests that Congress or the Executive, or both acting in concert and in compliance with Art. I, can decide the constitutionality of a statute; that is a decision for the courts."). *But see, e.g.*, *Nixon v. United States*, 506 U.S. 224 (1993) (whether Senate has violated its duty to "try" impeachments presents a political question); *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849) (Guarantee Clause is enforceable only by Congress). Similarly, that a case may involve the conduct of the nation's foreign affairs does not necessarily prevent a court from determining whether the Executive has exceeded the scope of prescribed statutory authority or failed to obey the prohibition of a statute or treaty. *See Japan Whaling*, 478 U.S. at 230 ("[O]ne of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because" of the "interplay" between the statute and "the conduct of this Nation's foreign relations."); *see, e.g.*, *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 254 n.25 (1984) (holding the political question doctrine does not bar consideration of whether a Civil Aeronautics Board order is inconsistent with the Warsaw Convention); *see also* David J.

Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 723 (2008) ("If there is a party with constitutionally sufficient standing to demand judicial protection from a presidential refusal to obey a statute during war, it is not clear why there should be a general rule that courts must leave the question to the political branches.").

We have consistently held, however, that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security. In this vein, we have distinguished between claims requiring us to decide whether taking military action was "wise"—"a 'policy choice[] and value determination[] constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch'"—and claims "[p]resenting purely legal issues" such as whether the government had legal authority to act. *Campbell v. Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring) (quoting *Japan Whaling*, 478 U.S. at 230). Accordingly, we have declined to adjudicate claims seeking only a "determination[] whether the alleged conduct *should* have occurred." *Harbury v. Hayden*, 522 F.3d 413, 420 (D.C. Cir. 2008). Despite some sweeping assertions to the contrary, *see, e.g.*, *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006) ("Whatever Kissinger did as National Security Advisor or Secretary of State can hardly be called anything other than foreign policy [unreviewable under the political question doctrine]." (internal quotation marks omitted)), the presence of a political question in these cases turns not on the nature of the government conduct under review but more precisely on the question the plaintiff raises about the challenged action. *See Campbell*, 203 F.3d at 40 (Tatel, J., concurring).

The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion. A plaintiff may not, for instance, clear the political question bar simply by "recasting [such] foreign policy and national security questions in tort terms." *Schneider*, 412 F.3d at 197 (explaining the courts could not determine whether taking military action was "wrongful" as an element of a wrongful death claim). Likewise—and contrary to the position adopted by Judge Kavanaugh—a statute providing for judicial review does not override Article III's requirement that federal courts refrain from deciding political questions. *See Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972) ("Congress may not confer jurisdiction on Art. III federal courts . . . to resolve 'political questions,' because suits of this character are inconsistent with the judicial function under Art. III." (internal citation omitted)); *cf. Gilligan*, 413 U.S. at 8–9 (stating a circuit judge "correctly read *Baker v. Carr*" when he wrote that "simply order[ing] compliance with the standards set by Congress" could "draw the courts into a nonjusticiable political question, over which we have no jurisdiction" (quoting *Morgan v. Rhodes*, 456 F.2d 608, 619 (6th Cir. 1972) (Celebrezze, J., concurring in part and dissenting in part))); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (declining to construe a statute to require judicial review of foreign policy decisions "wholly confided by our Constitution to the political departments of the government, Executive and Legislative"); *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) (citing *Waterman* for the proposition that "'[t]he judicial Power' created by Article III, § 1, of the Constitution is not *whatever* judges choose to do or even *whatever* Congress chooses to assign them" (citations omitted)). For example, in reviewing the Secretary of State's designation of

a group as a "foreign terrorist organization" under the Antiterrorism and Effective Death Penalty Act, 8 U.S.C. § 1189 (2006), we may decide whether the government has followed the proper procedures, whether the organization is foreign, and whether it has engaged in terrorist activity, but we may not determine whether "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States," *id.* § 1189(a)(1)(C). *See People's Mojahedin Org. of Iran v. U.S. Dep't of State (PMOI)*, 182 F.3d 17, 22–24 (D.C. Cir. 1999). Whether this last criterion has been met presents a nonjusticiable political question because the Secretary's assessments of whether the terrorist activities of foreign organizations constitute threats to the United States "are political judgments, 'decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.'" *PMOI*, 182 F.3d at 23 (quoting *Waterman*, 333 U.S. at 111). Neither a common law nor statutory claim may require the court to reassess "policy choices and value determinations" the Constitution entrusts to the political branches alone. *Japan Whaling*, 478 U.S. at 230.

The conclusion that the strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters. *See generally Nixon*, 506 U.S. at 228–29 ("[T]he concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate

branch."). We must decline to reconsider what are essentially policy choices because "[t]he Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Japan Whaling*, 478 U.S. at 230 (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981)). In military matters in particular, the courts lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded.

> The complex, subtle, and professional decisions as to the . . . control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Gilligan*, 413 U.S. at 10. It is not the role of judges to second-guess, with the benefit of hindsight, another branch's determination that the interests of the United States call for military action.

The case at hand involves the decision to launch a military strike abroad. Conducting the "discriminating analysis of the particular question posed" by the claims the plaintiffs press on appeal, *Baker*, 369 U.S. at 211, we conclude that both raise nonjusticiable political questions. The law-of-nations claim asks the court to decide whether the United States' attack on the plant was "mistaken and not justified." Compl. at 30. The defamation claim similarly requires us to determine the factual validity of the government's stated reasons for the strike. If the political

question doctrine means anything in the arena of national security and foreign relations, it means the courts cannot assess the merits of the President's decision to launch an attack on a foreign target, and the plaintiffs ask us to do just that. Therefore, we affirm the district court's dismissal of the plaintiffs' law-of-nations and defamation claims.

**A.**

The plaintiffs' complaint asserts that customary international law requires states to compensate foreign nationals for property destruction that is "mistaken and not justified." The United States purportedly violated this norm when the CIA denied the plaintiffs' request for compensation for the destruction of the plant. *See id.* at 29–30. Because we hold this claim barred by the political question doctrine, we need not decide whether customary international law requires compensation in these circumstances, or, if so, whether the plaintiffs have adequately stated a federal cause of action. *See generally Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004).

We begin our analysis with the rule we have already identified and upon which both parties agree: courts cannot reconsider the wisdom of discretionary foreign policy decisions. *See* Appellants' *En Banc* Br. at 22. The plaintiffs' law-of-nations claim falls squarely within this prohibition because it would require us to declare that the bombing of the El-Shifa plant was "mistaken and not justified." Whether an attack on a foreign target is justified—that is whether it is warranted or well-grounded—is a quintessential "policy choice[] and value determination[] constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling*, 478 U.S. at 230. The plaintiffs appear to recognize this. On appeal they imply that they need only prove the United States failed to compensate

them for an attack that was "mistaken." *See* Appellants' *En Banc* Br. at 49–54 & n.6; *see also id.* at 53 (conceding that "whether the attack was reasonable and justified when it occurred" presents a "nonjusticiable question"). By asserting the El-Shifa bombing was "mistaken," the plaintiffs apparently mean that the United States would not have launched the strike if the relevant decisionmakers knew at the time what they allegedly know now—that the plant was neither involved in producing chemical weapons nor associated with bin Laden. *See id.* at 9 (describing the plant as "targeted in error"); *id.* at 14 (arguing the bombing was mistaken because "evidence [has] emerged that the plant was in fact innocent property"). But the political question doctrine does not permit us to mimic the constitutional role of the political branches by guessing how they would have conducted the nation's foreign policy had they been better informed. Whether the circumstances warrant a military attack on a foreign target is a "substantive political judgment[] entrusted expressly to the coordinate branches of government," *Gilligan*, 413 U.S. at 11, and using a judicial forum to reconsider its wisdom would be anathema to the separation of powers. Undertaking a counterfactual inquiry into how the political branches would have exercised their discretion had they known the facts alleged in the plaintiffs' complaint would be to make a political judgment, not a legal one.

Moreover, *Baker*'s prudential considerations counsel judicial restraint as well. First, the court lacks judicially manageable standards to adjudicate whether the attack on the El-Shifa plant was "mistaken and not justified." *See Baker*, 369 U.S. at 217; *cf. Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–91 (1999) (explaining the courts are "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the government's "reasons

for deeming nationals of a particular country a special threat"). We could not decide this question without first fashioning out of whole cloth some standard for when military action is justified. The judiciary lacks the capacity for such a task. As we once said of a claim that certain covert operations were "wrongful," "There are no [judicially] discoverable and manageable standards for the resolution of such a claim." *Schneider*, 412 F.3d at 197; *see also id.* ("To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking."). Second, the decision to take military action is a "policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Such foreign policy decisions are "delicate, complex, and involve large elements of prophecy. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ." *Waterman*, 333 U.S. at 111. In short, the decision to launch the military attack on the El-Shifa plant was constitutionally committed to the political branches, *see, e.g.*, U.S. CONST. art. I, § 8, cl. 11; *id.* art. II, § 2, cl. 1; *see also Schneider*, 412 F.3d at 194–95, and this court is neither an effective nor appropriate forum for reweighing its merits. *See Harbury*, 522 F.3d at 420. Because the plaintiffs' law-of-nations claim requires the court to second-guess that decision, we conclude that it presents a nonjusticiable political question.

Indeed, the law-of-nations claim suffers from flaws similar to those the Federal Circuit identified in the plaintiffs' previous claim that the bombing was a taking because it was mistaken. As the Federal Circuit explained, "In essence . . . the [plaintiffs] are contending that the President failed to assure himself with a sufficient degree of certainty" of the factual basis for his decision to strike the plant. *El-Shifa*, 378 F.3d at 1365. The plaintiffs would have the federal

courts "provide them with an opportunity to test that contention, and in the process, require this court to elucidate the . . . standards that are to guide a President when he evaluates the veracity of military intelligence." *Id.* This we cannot do.

In refusing to declare the El-Shifa attack "mistaken and not justified," we do not mean to imply that the contrary is true. We simply decline to answer a question outside the scope of our authority. By requiring that we reserve judgment, the political question doctrine protects the Congress and the Executive from judicial "invasion of their sphere," *Antolok v. United States*, 873 F.2d 369, 383 (D.C. Cir. 1989) (opinion of Sentelle, J.), and guards against "the reputation of the Judicial Branch [being] 'borrowed by the political Branches to cloak their work in the neutral colors of judicial action,'" *PMOI*, 182 F.3d at 25 (quoting *Mistretta v. United States*, 488 U.S. 361, 407 (1989)).

## B.

The plaintiffs also claim that anonymous government officials defamed them by making statements linking them to bin Laden and international terrorism. This claim fares no better than their law-of-nations claim. It too would require the court to reconsider the merits of the decision to strike the El-Shifa plant by determining whether the government's justifications for the attack were false. *See* RESTATEMENT (SECOND) OF TORTS § 558(a) (1977).

We begin by noting that the court cannot judge the veracity of the President's initial public explanations for the attack for the same reasons we cannot examine whether the attack was "mistaken and not justified." The President's statements justifying the attack are "inextricably intertwined" with a foreign policy decision constitutionally committed to

the political branches, *Bancoult*, 445 F.3d at 436, because determining whether the President's statements were true would require a determination "whether the alleged conduct *should* have occurred," *Harbury*, 522 F.3d at 420. A decision in favor of the plaintiffs would unavoidably involve a rejection of the Clinton Administration's stated justifications for launching the missile strike. A decision against the plaintiffs would affirm the wisdom of the Administration's decision to attack.

The plaintiffs maintain, however, that even if the political question doctrine bars review of the President's initial justifications for the attack, the court may nevertheless judge the veracity of the subsequent justifications, which, they allege, offer different explanations for the strike. These allegedly defamatory statements are reviewable, the plaintiffs contend, because they do not state "the *actual* justification for the decision to attack the plant." Appellants' *En Banc* Reply Br. at 3. Rather, the plaintiffs allege that these statements are "*post hoc* pretext"—defamatory efforts at political damage control. *Id.*; *see also* Compl. at 1 (stating the action arises out of "false and defamatory statements made by United States government officials seeking to justify" the destruction of the plant); Compl. at 21–22 (alleging "government officials continued to justify their actions with statements intended to suggest that Mr. Idris was, in fact, associated with terrorism."). According to the plaintiffs, we can review these later justifications for the attack because they bear no relation to the President's initial justifications—that the plant was associated with bin Laden and involved in producing chemical weapons.

We disagree. The allegedly defamatory statements cannot be severed from the initial justifications for the attack. The court cannot adjudicate the truth of the government's later

justifications because, despite the plaintiffs' arguments to the contrary, they are fundamentally the same as the initial justifications. In reaching this conclusion, we need look no further than the plaintiffs' complaint. Taking all of its allegations as true, we find no material difference between the allegedly defamatory statements and the President's contemporaneous explanation of his decision to take military action. On the day the United States destroyed the El-Shifa plant, President Clinton told the American people that he ordered the strike in part because the plant was "associated with the bin Laden network" and was a "chemical weapons-related facility." Compl. at 7, 13; *see also* Address to the Nation, 2 PUB. PAPERS at 1461; President William J. Clinton, Remarks in Martha's Vineyard, Massachusetts, on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 PUB. PAPERS 1460, 1460 (Aug. 20, 1998). In their prayer for relief, the plaintiffs describe the allegedly defamatory statements as "claims . . . that Mr. Idris or El-Shifa are [sic] connected to Osama bin Laden, terrorist groups or the production of chemical weapons." Compl. at 31; *see also id.* at 19 (detailing "numerous statements to news reporters falsely describing Salah Idris as an associate of Osama bin Laden and international terrorist organizations"). This characterization of the allegedly defamatory statements closely tracks the President's own description of his reasons for launching the attack.

All of the allegedly defamatory statements essentially repeat the President's initial justification for the strike. Each describes a connection between bin Laden and the plant through its owner, Salah Idris. For example, "U.S. intelligence officials" stated Idris dealt financially with members of Islamic Jihad, which had been "absorbed into [bin Laden's] terror network." *Id.* at 20. And government officials claimed "the owner and manager of the plant

were . . . front men for bin Laden." *Id.*; *see also id.* at 19 (citing a "Washington official" describing Idris as "a partner with bin Laden in other Sudanese businesses"); *id.* at 19–20 (quoting "one official" asserting that Idris "may have" purchased the El-Shifa plant "on bin Laden's behalf" and "that he's involved in money laundering, that he's involved in representing a lot of bin Laden's interests in Sudan"). Contrary to the plaintiffs' contentions, these statements do not represent a break from the President's contemporaneous explanation of his reasons for launching the strike. At most, they elaborate upon the nature of the connection between the plant and bin Laden—a connection the President offered on the day of the attack as one reason for taking military action. Declaring these later statements true or false would require us to make the same judgment about the President's initial justification for the attack.

The plaintiffs contend that Idris's alleged ties to bin Laden—the factual issue at the heart of their defamation claim—could not have played any part in the decision to bomb the plant because, at the time of the strike, the United States thought the plant was owned by the Sudanese government and not by Idris. Therefore, they argue, the court could declare the government's allegations that Idris was connected to bin Laden false without undermining the government's actual justifications for the attack. *See* Appellants' *En Banc* Br. at 25; Appellants' *En Banc* Reply Br. at 2–3. To be sure, at least one anonymous official had previously suggested the plant belonged to the Sudanese Military Industrial Complex. *See* Compl. at 13. But this is beside the point. As the plaintiffs conceded before the *en banc* court, "[T]he owner of the plant was immaterial to [President Clinton's] decision to attack the plant." Oral Arg. Recording at 11:48–:51. The President explained that the United States targeted the plant because it was associated with bin Laden,

and officials continued to assert that same rationale when they told reporters the plant's owner was financially linked to bin Laden's network. A court's pronouncement that the plant's owner had no financial ties to bin Laden would directly contradict the government's justification for the attack by disclaiming the asserted association between the plant and the bin Laden network.

The plaintiffs further argue that the political question doctrine does not block their defamation claim because "*by the government's own admission*, the accusations challenged as defamatory formed no part of the decision to attack the plant." Appellants' *En Banc* Br. at 24 (emphasis added). But none of the statements quoted in the complaint imply such an admission. The plaintiffs rely on one statement, which referenced "[n]ew evidence obtained since the attack." *See id.* at 24–25 (quoting Compl. at 19). The rest of the statement, however, makes clear that their reliance is misplaced: "New evidence obtained since the attack, one official said . . . , starts to make the link between the plant's current owner, Salaheldin Idris, and bin Laden 'more direct.'" Compl. at 19. The official's assertion that new evidence made the connection between bin Laden and Idris "more direct" does not give rise to an inference, as the plaintiffs suggest, that there was no prior evidence of such a nexus. Indeed, the statement of another anonymous official quoted in the complaint suggests that the newer evidence merely corroborated the evidence existing at the time of the attack. *See id.* at 20 (quoting an anonymous official's statement that intelligence collected after the strike "*increasingly* points to ties with (Osama) bin Laden" (emphasis added)). This emphasizes that the veracity of the allegedly defamatory statements is "inextricably intertwined," *Bancoult*, 445 F.3d at 436, with the merits of the actual justifications for the attack

and underscores the nonjusticiability of the plaintiffs' defamation claim.

## C.

We conclude our political question analysis by addressing the plaintiffs' argument that they are asking nothing more than that we review the government's designation of them as supporters of the nation's enemies, something courts have done in other contexts. *See* Appellants' *En Banc* Br. at 23–30. This argument fails.

The plaintiffs point first to cases permitting judicial review of the enemy status of persons detained after being seized by the U.S. military on the battlefield. *See, e.g.*, *Boumediene v. Bush*, 128 S. Ct. 2229 (2008); *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008). But the political question doctrine does not preclude judicial review of prolonged Executive detention predicated on an enemy combatant determination because the Constitution specifically contemplates a judicial role in this area. *See Boumediene*, 128 S. Ct. at 2247 ("The [Suspension] Clause protects the rights of the detained by affirming *the duty and authority of the Judiciary* to call the jailer to account." (emphasis added)); *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (discussing the courts' "time-honored and constitutionally mandated roles of reviewing and resolving claims" of citizens challenging their military detention). The plaintiffs can point to no comparable constitutional commitment to the courts for review of a military decision to launch a missile at a foreign target. *Cf. Bancoult*, 445 F.3d at 437 ("[W]hile the presence of constitutionally-protected liberties could require us to address limits on the foreign policy and national security powers assigned to the political branches, no such constitutional claims are at issue in this case.").

The plaintiffs also point to another line of cases in which courts have reviewed Executive Branch determinations that a certain asset is "enemy property" or belongs to a terrorist organization and therefore is eligible for seizure pursuant to statute. *See, e.g.*, *Chai v. Dep't of State*, 466 F.3d 125 (D.C. Cir. 2006); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003); *Von Zedtwitz v. Sutherland*, 26 F.2d 525 (D.C. Cir. 1928); *Bond v. United States*, 2 Ct. Cl. 529 (1866). These cases are not helpful to the plaintiffs for the same reasons the detainee cases are not. None required the courts to scrutinize a decision constitutionally committed wholly to the political branches. Indeed, the Supreme Court has suggested that judicial review of enemy-property designations made to effect statutorily authorized asset seizures is constitutionally mandated. *See Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 210–11 (1958) ("[The] summary power to seize property which is believed to be enemy-owned is rescued from constitutional invalidity under the Due Process and Just Compensation Clauses of the Fifth Amendment only by those provisions of the Act which afford a non-enemy claimant a later judicial hearing as to the propriety of the seizure."); *cf. Bancoult*, 445 F.3d at 435 ("[C]laims based on the most fundamental liberty and property rights of this country's citizenry, such as the Takings and Due Process Clauses of the Fifth Amendment, are justiciable, even if they implicate foreign policy decisions." (internal quotation marks and citations omitted)). No comparable constitutional commitment to the judiciary exists in this case. *See Paul v. Davis*, 424 U.S. 693, 701 (1976) (holding that defamation by the government, when it harms "reputation alone," does not constitute a deprivation of liberty or property under the Due Process Clause). The plaintiffs do not ask whether the government's conduct was prohibited by the Constitution. Instead, they seek declarations that the

President should not have launched a military strike that the plaintiffs deem unwise and ill founded, and an injunction requiring the government to retract its justifications for the attack. The Constitution denies the courts the ability to grant such extraordinary relief.

## III.

Our colleagues agree that the district court lacked jurisdiction but would affirm on a different ground. Their proposed alternative relies on the rule that federal courts lack jurisdiction to hear legally "insubstantial" claims. The Supreme Court and this court have applied this rule narrowly, setting a high bar for dismissal that plaintiffs' claims do not meet.

"Dismissal for lack of subject-matter jurisdiction because of the inadequacy of [a] federal claim is proper only when the claim is so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (internal quotation marks omitted). *But see, e.g.*, *Rosado v. Wyman*, 397 U.S. 397, 404 (1970) (characterizing this doctrine as "more ancient than analytically sound"). This ground for jurisdictional dismissal "is, as a general matter, reserved for complaints resting on truly fanciful *factual* allegations," *Best v. Kelly*, 39 F.3d 328, 331 n.5 (D.C. Cir. 1994), but also has some limited application to claims resting on insubstantial legal theories.

> [L]egal claims may be so insubstantial as to deprive federal courts of jurisdiction if "prior decisions inescapably render the claims frivolous." *Hagans* [*v. Lavine*, 415 U.S. 528, 538 (1974)]. That said, "previous decisions that merely render claims of

doubtful or questionable merit do not render them insubstantial." *Id.* Thus, to qualify as insubstantial, a claim's "unsoundness [must] so clearly result[] from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." *Ex parte Poresky*, 290 U.S. 30, 32 (1933) (internal quotation marks omitted).

*Ord v. District of Columbia*, 587 F.3d 1136, 1144 (D.C. Cir. 2009) (some alterations in original).

Plaintiffs' claims are not so unsound as to warrant dismissal on this jurisdictional ground. There is "room for the inference that the question[s] sought to be raised can be the subject of controversy." *Poresky*, 290 U.S. at 32; *see, e.g.*, *El-Shifa*, 559 F.3d at 591–92 (Ginsburg, J., dissenting) ("Some of our cases do imply a plaintiff may obtain a retraction from the United States for defamation by one of its officers. . . . Federal rather than D.C. common law likely governs Idris's claim . . . ."). Perhaps the district court would have dismissed plaintiffs' claims for failure to state a claim under Rule 12(b)(6) had the case proceeded to the merits. But whether a claim is so insubstantial as to deprive the federal courts of jurisdiction is a "separate question from whether a complaint is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim on which relief may be granted." *Ord*, 587 F.3d at 1144. The cases relied upon by the concurrence might "render [plaintiffs'] claims of doubtful or questionable merit," but they do not "foreclose the subject" and therefore "do not render them insubstantial." *Id.* at 1144 (quoting *Hagans*, 415 U.S. at 538, and *Poresky*, 290 U.S. at 32). "Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which

petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946).

## IV.

Our concurring colleagues charge the court with "*sub silentio* expand[ing] executive power." Concurring Op. of Judge Ginsburg at 3 (quoting Concurring Op. of Judge Kavanaugh at 11). To the contrary, it is they who would work a *sub silentio* expansion. By asserting the authority to decide questions the Constitution reserves to Congress and the Executive, some would expand judicial power at the expense of the democratically elected branches. And by stretching beyond all precedent the limited category of claims so frivolous as not to involve a federal question, all would permit courts to decide the merits of disputes under the guise of a jurisdictional holding while sidestepping obstacles that are truly jurisdictional.

Straightforward application of our precedent makes clear that the plaintiffs face such an obstacle here. Under the political question doctrine, the foreign target of a military strike cannot challenge in court the wisdom of retaliatory military action taken by the United States. Despite their efforts to characterize the case differently, that is just what the plaintiffs have asked us to do. The district court's dismissal of their claims is

*Affirmed.*

GINSBURG, *Circuit Judge*, with whom *Circuit Judge* ROGERS joins, concurring in the judgment: I join Part I of Judge Kavanaugh's opinion concurring in the judgment because the plaintiffs have not alleged a non-frivolous cause of action; I write separately to make an additional point about the opinion for the Court. That opinion expands the political question doctrine well beyond the bounds delineated in *Baker v. Carr*, 369 U.S. 186 (1962), and the Court's need to consider whether application of the political question doctrine in a statutory case threatens the separation of powers arises only because of that unwarranted expansion.

The Court today expands the political *question* doctrine by reading into several of our recent cases something of a new political *decision* doctrine. On that approach, we are first to identify some "conduct" or "decision" (the opinion alternates) constitutionally committed to the Executive and then to ask whether the plaintiff's "claim[] ... call[s] into question," "require[s] the court to reassess," or is "inextricably intertwined with" that Executive conduct or decision. Op. at 12, 13, 18. If so, then the claim is non-justiciable, regardless whether the court would actually have to decide a political question in order to resolve it.

The Court's approach departs sharply from that prescribed in *Baker v. Carr*, which calls for a "discriminating inquiry into the precise facts and posture of the particular case" in order to detect "a political question's presence," 369 U.S. at 217; unless there is such a question and it is "inextricable from the case at bar," *id.*, then we are to decide it, even if "our decision may have significant political overtones." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986); *see also Campbell v. Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring) ("Resolving the issue in this case would require us to decide not whether the air campaign was wise ... but whether the President possessed legal authority to conduct the military operation"). The

innovation adopted by the Court contravenes the Supreme Court's teaching that "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.'" *Baker*, 369 U.S. at 217.

If the Court today followed *Baker v. Carr*, then there would be no occasion to consider whether the application of the political question doctrine in a statutory case threatens the separation of powers by, as Judge Kavanaugh says, "systematically favor[ing] the Executive Branch over the Legislative Branch," Op. at 10. Under *Baker v. Carr* a statutory case generally does not present a non-justiciable political question because "the interpretation of legislation is a 'recurring and accepted task for the federal courts.'" *Id.* at 9 (quoting *Japan Whaling*, 478 U.S. at 230). For rare exceptions in which a statute called for a decision constitutionally committed to the President and hence not subject to judicial review, see *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948), and *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("Of the three findings mandated by [the Statute, Secretary of State's finding that an organization's terrorist activity threatens national security] ... is nonjusticiable").

Under the Court's new political decision doctrine, however, even a straightforward statutory case, presenting a purely legal question, is non-justiciable if deciding it could merely reflect adversely upon a decision constitutionally committed to the President. *Compare, e.g.*, *Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1234-35 (2009) (Edwards, J., concurring) ("The Secretary's first argument — that Zivotofsky's claim is a nonjusticiable political question — is specious. ... These questions involve commonplace issues of statutory and constitutional interpretation, and they are plainly

matters for the court to decide.") *with id.* at 1232 (Griffith, J., for the court) (plaintiff "invites the courts to call into question the President's exercise of the recognition power. This we cannot do. We therefore hold [his statutory] claim presents a nonjusticiable political question because it trenches upon the President's constitutionally committed recognition power."). As Judge Kavanaugh notes, such a holding "*sub silentio* expand[s] executive power [at the expense of the legislature]." Op. at 11. The result of staying the judicial hand is to upset rather than to preserve the constitutional allocation of powers between the executive and the legislature.

KAVANAUGH, *Circuit Judge*, with whom *Chief Judge* SENTELLE joins, and with whom *Circuit Judges* GINSBURG and ROGERS join as to Part I, concurring in the judgment:

In August 1998, President Clinton ordered the U.S. military to bomb both the El-Shifa factory in Sudan and al Qaeda training camps in Afghanistan. The goals were to kill leaders of al Qaeda and to destroy al Qaeda infrastructure. President Clinton explained to Congress and the American people that he ordered the bombings in furtherance of the Nation's "inherent right of self-defense" in the wake of al Qaeda attacks on U.S. property and personnel in Kenya and Tanzania. As authority for the bombings, President Clinton cited his Commander-in-Chief power under Article II of the Constitution.

Plaintiffs El-Shifa Pharmaceutical Industries Company and its owner, Salah Idris, allege that their factory in Sudan was wrongly destroyed in the bombings and that they were reputationally harmed by later Executive Branch statements linking them to Osama bin Laden. As relevant here, they have brought a federal defamation claim and an Alien Tort Statute claim against the United States.

The Government correctly contends that plaintiffs have not alleged a cognizable cause of action; indeed, plaintiffs have not come close. Plaintiffs' complaint should be dismissed on that basis alone, as Part I of this opinion explains. But the majority opinion instead relies on the political question doctrine to dismiss the complaint. I disagree with the majority opinion's political question analysis, as Part II of this opinion spells out.

I

Federal courts lack subject matter jurisdiction over claims that are "so insubstantial, implausible, foreclosed by prior

decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (internal quotation marks omitted). Plaintiffs' two claims in this case fall into that category.

El-Shifa Pharmaceutical Industries Company operated a factory in Sudan that was bombed in August 1998 by the United States military, at the specific direction of President Clinton. In later press reports, anonymous U.S. Government officials were quoted as linking El-Shifa and its owner, Idris, to Osama bin Laden. El-Shifa and Salah Idris then sued the United States, advancing two claims of relevance here. First, to obtain relief for the allegedly false statements by Government officials that had linked plaintiffs to bin Laden, plaintiffs raised a federal defamation claim against the United States. The problem for plaintiffs is that there is no federal cause of action for defamation available against the United States. Second, plaintiffs claimed that the failure of the United States to compensate them for the allegedly mistaken bombing and destruction of their property violated a customary international law norm recognized under the Alien Tort Statute, 28 U.S.C. § 1350. But plaintiffs have cited no customary international law norm that would require compensation by the United States under the Alien Tort Statute for mistaken war-time bombings.

A

First, plaintiffs assert a federal defamation claim against the United States. There is no such cause of action.

Congress has enacted a number of causes of action that can be brought against the United States or against Government officials for acts taken in their official capacities.

*See, e.g.*, Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*; Federal Tort Claims Act, 28 U.S.C. § 1346; Westfall Act, 28 U.S.C. § 2679; Tucker Act, 28 U.S.C § 1491, 28 U.S.C. § 1346(a)(2). But Congress has not created a defamation cause of action against the United States.

Moreover, the Supreme Court has never recognized a federal common-law defamation cause of action against the United States. Indeed, the Court has not endorsed any federal common-law causes of action against the Government during the post-*Erie* period. And the Court several times has expressly declined to do so, noting that creation of new causes of action is a function typically best left to Congress. *See, e.g.*, *U.S. Postal Serv. v. Flamingo Indus.*, 540 U.S. 736, 744-45 (2004); *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994); *FDIC v. Meyer*, 510 U.S. 471, 483-86 (1994); *United States v. California*, 507 U.S. 746, 759-60 (1993); *United States v. Standard Oil Co.*, 332 U.S. 301, 313-16 (1947).

Plaintiffs cite three cases from this Court to support their argument that there is a federal common-law cause of action for defamation available against the United States. *See U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993); *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987); *Expeditions Unlimited Aquatic Enters. v. Smithsonian Inst.*, 566 F.2d 289, 294 n.16 (D.C. Cir. 1977) (en banc). But none of those decisions holds that there is such a federal common-law cause of action.

In this Court, plaintiffs also attempt to argue that the Administrative Procedure Act supplies a cause of action for defamation. But that, too, is wrong; the APA contains no cause of action for defamation. Moreover, plaintiffs cannot use the APA – which, as relevant here, prohibits executive

action that is "not in accordance with law" – to vindicate a purported federal common-law right that does not exist. 5 U.S.C. § 706(2)(a); *see also Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 245 (D.C. Cir. 1981).

In addition to a *federal* common-law cause of action, plaintiffs might also be alleging a purported *state* common-law cause of action against the United States, although their complaint never quite says as much. Even so, any such state-law cause of action may not be brought against the United States absent congressional authorization to that effect. *Cf. Tarble's Case*, 80 U.S. 397, 406 (1871); *Barr v. Matteo*, 360 U.S. 564, 569-71 (1959) (federal officers acting in their official capacities have immunity from suit, including against state-law defamation suits). In our constitutional system, the states do not regulate the Federal Government, either directly or through state tort law, at least absent congressional consent. U.S. CONST. art. VI, cl. 2. The FTCA and Westfall Act do expressly borrow (or permit) state tort causes of action against the United States in certain carefully defined circumstances. But those statutes do not apply here, as plaintiffs concede. And contrary to plaintiffs' inventive arguments, the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States. As counsel for the Government succinctly and correctly stated at oral argument: "State tort law doesn't run against the United States, so it's not a federal law that can be pointed to as a substantive law which is being transgressed for an APA cause of action." Tr. of Oral Arg. at 52; *see In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006).[1]

---

[1] Plaintiffs have not contended that the relevant agency actions were arbitrary and capricious under the APA. Even if they had, they would face a variety of hurdles – including 5 U.S.C.

5

B

Plaintiffs also seek a declaration that the United States violated customary international law, as cognizable under the Alien Tort Statute, 28 U.S.C. § 1350, because the United States failed to compensate plaintiffs for the allegedly mistaken destruction of their property.

The Alien Tort Statute, or ATS, authorizes suits brought "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS covers "a relatively modest set of actions alleging violations of the law of nations" – including certain norms established as of 1789, which the Court identified as "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 720, 724 (2004). The ATS may encompass other established customary international law norms so long as they do not have "less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted" in 1789. *Id*. at 732.

Plaintiffs allege that the actions of the United States violated an established customary international law norm – namely, "the obligation of a government to compensate citizens of other nations for the mistaken destruction of their innocent property." El-Shifa Br. at 49 n.6. But plaintiffs cite no authority suggesting that the mistaken destruction of property during extraterritorial war-related activities – or

§ 701(a)(2), which exempts from APA review agency action that is committed to agency discretion by law. Furthermore, any such APA claim would rest on the proposition that the statements of anonymous officials constitute final agency action. *See* 5 U.S.C. § 704. There is no support in our precedents for that conclusion.

denial of an administrative claim seeking compensation for the same – violates an established norm of customary international law. Furthermore, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Sosa*, 542 U.S. at 732-33. If the plaintiffs were correct, the federal courts presumably would be flooded with ATS claims – at a minimum, claims seeking declaratory relief for alleged violations of customary international law norms – against the United States for allegedly mistaken property damage in every war, including the ongoing wars in Iraq and Afghanistan. Plaintiffs provide no persuasive reason for the federal judiciary to embark on such a novel and far-reaching endeavor in the absence of congressional direction.

In short, plaintiffs' attorneys have worked hard to find some basis in law for plaintiffs' complaint. But they have located no such basis: Plaintiffs' two claims are "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co.*, 523 U.S. at 89. The District Court's judgment dismissing plaintiffs' complaint should be affirmed for that reason alone. [2]

---

[2] If a majority of the Court had been willing to dismiss plaintiffs' claims on this basis for lack of subject-matter jurisdiction, the Court could have avoided the need to confront the significant constitutional question whether plaintiffs' claims raise a nonjusticiable political question. *Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513 (2009).

II

The straightforward approach outlined in Part I of this opinion would readily resolve this case. But the majority opinion instead relies on the notoriously "murky and unsettled" political question doctrine to dismiss the complaint. *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (1984) (Bork, J., concurring). Because of the importance of the political question doctrine to the law of this Circuit, I believe it important to respond to the majority opinion and to explain my disagreement with its political question theory.

The key point for purposes of my political question analysis is this: Plaintiffs do not allege that the Executive Branch violated the Constitution. Rather, plaintiffs allege that the Executive Branch violated congressionally enacted statutes that purportedly constrain the Executive. The Supreme Court has never applied the political question doctrine in cases involving statutory claims of this kind. As Judge Edwards has correctly explained, the proper separation of powers question in this sort of statutory case is whether the statute as applied infringes on the President's exclusive, preclusive authority under Article II of the Constitution. *See Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1240-45 (D.C. Cir. 2009) (Edwards, J., concurring). That is a weighty question – and one that must be confronted directly through careful analysis of Article II, not resolved *sub silentio* in favor of the Executive through use of the political question doctrine.

A

The political question doctrine has occupied a more limited place in the Supreme Court's jurisprudence than is

sometimes assumed.[3]   The Court has relied on the doctrine only twice in the last 50 years.  *See Walter Nixon v. United States*, 506 U.S. 224 (1993); *Gilligan v. Morgan*, 413 U.S. 1 (1973).  The Court has invoked the doctrine in cases in which (i) the Constitution textually and exclusively commits interpretation of the relevant constitutional provision to one or both of the political branches or (ii) the constitutional provision at issue supplies no judicially manageable or discoverable standards for resolving the case.  *See Walter Nixon*, 506 U.S. at 228.

---

[3] The Supreme Court does not decline to resolve a case on political question grounds simply because the dispute involves or would affect national security or foreign relations.  Indeed, from the time of John Marshall to the present, the Court has decided many sensitive and controversial cases that had enormous national security or foreign policy ramifications.  *See, e.g.*, *Boumediene* v. *Bush*, 128 S. Ct. 2229 (2008); *Medellín v. Texas*, 552 U.S. 491 (2008); *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *Kent v. Dulles*, 357 U.S. 116 (1958); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Johnson v. Eisentrager*, 339 U.S. 763 (1950); *Korematsu v. United States*, 323 U.S. 214 (1944); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936); *Ex parte Milligan*, 71 U.S. 2 (1866); *Prize Cases*, 67 U.S. 635 (1863); *Little v. Barreme*, 6 U.S. 170 (1804); *see also* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb – Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 723 (2008) ("the Supreme Court's jurisprudence, stretching from early in our history through *Youngstown* to numerous contemporary war powers cases, is rife with instances of the Court's resolving questions of the Executive's war powers, just as it has adjudicated other separation of powers disputes between the political departments").

Importantly, the Supreme Court has invoked the political question doctrine only in cases alleging violations of the Constitution. This is a statutory case. The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations. Never.

As the Supreme Court has explained, the interpretation of legislation is a "recurring and accepted task for the federal courts." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Under Article III of the Constitution, "one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.*; *see also* 13C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3534.2, at 752 (3d ed. 2008) ("[I]nterpretation of statutes affecting foreign affairs is not likely to be barred by [the] political-question doctrine."); ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 1.3, at 15 (5th ed. 2007) ("Under current law, the political question doctrine consigns certain allegations of *constitutional violations* to the other branches of government for adjudication and decision, even if all other jurisdictional and justiciability requirements are met.") (emphasis added).[4]

There is good reason the political question doctrine does not apply in cases alleging statutory violations. If a court refused to give effect to a statute that regulated Executive conduct, it necessarily would be holding that Congress is

---

[4] If a statute regulating private conduct provides no discernible standards and therefore insufficient notice of what actions are prohibited, the statute might be void for vagueness under the Due Process Clause. *See Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964). But that is not a political question doctrine determination.

unable to constrain Executive conduct in the challenged sphere of action. As a result, the court would be ruling (at least implicitly) that the statute intrudes impermissibly on the Executive's prerogatives under Article II of the Constitution. In other words, the court would be establishing that the asserted Executive power is exclusive and preclusive, meaning that Congress cannot regulate or limit that power by creating a cause of action or otherwise.

Applying the political question doctrine in statutory cases thus would not reflect benign deference to the political branches. Rather, that approach would systematically favor the Executive Branch over the Legislative Branch – without the courts' acknowledging as much or grappling with the critical separation of powers and Article II issues. The fact that use of the political question doctrine in statutory cases loads the dice against the Legislative Branch presumably explains why there is no Supreme Court precedent applying the doctrine in statutory cases – and why the Executive Branch (sometimes wary, for a variety of reasons, of advancing a straight Article II argument) may want the courts to invoke the doctrine in statutory cases of this sort. *Cf.* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb – Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 723-24 (2008) ("One need only consider the cases that could arise in the contemporary setting to see that leaving the question of the President's constitutional authority to defy a statutory restriction on his war powers to the give-and-take of the political branches would be quite radical in its implications. . . . [T]he insistence that allocation of war powers should be 'left to politics' would hardly be a neutral solution to the problem: it would inevitably tilt the constitutional structure decidedly in favor of executive supremacy.").

11

In short, the question whether a statute intrudes on the Executive's exclusive, preclusive Article II authority must be confronted directly through careful analysis of Article II – not answered by backdoor use of the political question doctrine, which may *sub silentio* expand executive power in an indirect, haphazard, and unprincipled manner. It is particularly important to confront the question directly because of the significance of such questions to our constitutional separation of powers. As Justice Jackson rightly explained, any claim of exclusive, preclusive Executive authority – particularly in the national security arena – "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

B

The approach suggested in this opinion is consistent with the results, if not all the reasoning, of this Court's recent cases declining to entertain certain tort suits in the national security arena. In those cases, as in this case, the plaintiffs asserted no cognizable cause of action. *See Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008); *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260 (D.C. Cir. 2006); *Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005). The Federal Tort Claims Act does not apply to suits for actions that occur in foreign countries or that encompass discretionary functions, among other exceptions. The Alien Tort Statute has never been held to cover suits against the United States or United States Government officials; the statute furnishes no waiver of sovereign immunity. And as we explained in *Harbury*, the Torture Victim Protection Act does not extend to suits against American officials except in the unusual case where such an official acts "under color of foreign law."

12

The absence of a cause of action covering the national security activities at issue in *Harbury*, *Gonzalez-Vera*, *Bancoult*, *Schneider*, or this case is hardly surprising. The political branches, mindful of the need for Executive discretion and flexibility in national security and foreign affairs, are unlikely to unduly hamper the Executive's ability to protect the Nation's security and diplomatic objectives. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320-22 (1936). Relatedly, it is well-established that courts must be cautious about interpreting an ambiguous statute to constrain or interfere with the Executive Branch's conduct of national security or foreign policy. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 529-30 (1988); *United States v. Johnson*, 481 U.S. 681, 690-91 (1987); *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004).[5] And apart from all that, if a statute were passed that clearly limited the kind of Executive national security or foreign policy activities at issue in these cases, such a statute as applied might well violate Article II. *Cf. Zivotofsky*, 571 F.3d at 1240-45 (Edwards, J., concurring).

The main point here is that those issues should be confronted directly and carefully, not resolved *sub silentio* in favor of the Executive through invocation of the political question doctrine in a situation where the Supreme Court has never seen fit to employ it.

---

[5] In cases reviewing the Executive's designation of foreign terrorist organizations, we held that the statute left to the Executive Branch the determination whether a group threatened the security of the United States. *See People's Mojahedin v. Dep't of State*, 182 F.3d 17, 23-25 (D.C. Cir. 1999). This seems a straightforward application of *Dep't of the Navy v. Egan*'s principle of statutory interpretation, not any broad holding about the political question doctrine.

C

To say that the courts must directly confront the critical separation of powers and Article II issues posed by this kind of statutory case is not to say that the Executive lacks any exclusive, preclusive Article II authority. The Executive plainly possesses a significant degree of exclusive, preclusive Article II power in both the domestic and national security arenas. *See, e.g.*, *Ex parte Garland*, 71 U.S. 333, 380 (1867) (pardon power "of the President is not subject to legislative control.").

In the national security realm, although the topic is of course hotly debated, most acknowledge at least some areas of exclusive, preclusive Presidential power – where Congress cannot regulate and the Executive "wins" even in Justice Jackson's *Youngstown* Category Three. For example, courts have generally accepted that the President possesses exclusive, preclusive power under the Commander-in-Chief Clause of Article II to command troop movements during a congressionally authorized war. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 591-92 (2006) ("neither can the President, in war more than in peace, intrude upon the proper authority of Congress, nor Congress upon the proper authority of the President. . . . Congress cannot direct the conduct of campaigns") (quoting *Ex parte Milligan*, 71 U.S. 2, 139 (1866) (separate opinion of Chase, C.J.)).

This case involves President Clinton's unilateral decision to bomb suspected al Qaeda targets. In the wake of the August 1998 al Qaeda attacks on U.S. personnel and property in Tanzania and Kenya, President Clinton ordered these attacks "in exercise" of the United States' "inherent right of self-defense." Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and

Sudan, 2 PUB. PAPERS 1464 (Aug. 21, 1998). As authority for the bombings, President Clinton cited his Commander-in-Chief power under Article II.

A statute regulating or creating a cause of action to challenge the President's short-term bombing of foreign targets in the Nation's self-defense (or contesting the Executive Branch's subsequent statements about it as defamatory) might well unconstitutionally encroach on the President's exclusive, preclusive Article II authority as Commander in Chief. *Cf. Prize Cases*, 67 U.S. 635, 668 (1863) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority."); 4A Op. Off. Legal Counsel 185 (1980).

But we need not definitively answer the sensitive and weighty Article II question in this case. As explained in Part I of this opinion, Congress has not created any cognizable cause of action that would apply to President Clinton's decision to bomb El-Shifa or later Executive Branch statements about the bombing. Indeed, the only remotely relevant statute in this case is the War Powers Resolution, which seems to support the President's authority to conduct unilateral military operations for at least 62 days without specific congressional approval. *See* 50 U.S.C. § 1544(b).

Given that no cause of action exists here, the political question and Article II issues in this case have an abstract and hypothetical air to them. In these circumstances, we would be wise to heed Justice Jackson's cautionary words. We should decline the opportunity to expound on the scope of the President's exclusive, preclusive Commander-in-Chief authority under Article II. I respectfully disagree with the

majority opinion's doing so – and particularly its doing so indirectly through reliance on the political question doctrine.

\* \* \*

I would dismiss plaintiffs' complaint because plaintiffs' two claims are "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).