BROWN, Circuit Judge,
concurring:
Theory holds that courts must apply the political question doctrine to circumstances where decision-making, and the constitutional interpretation necessary to that process, properly resides in the political branches of government. But theory often does not correspond with reality. The world today looks a lot different than it did when the Supreme Court decided Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Our latest phase in the evolution of asymmetric warfare continues to present conundrums that seem to defy solution. Today, the Global War on Terror has entered a new chapter — in part because of the availability of “sophisticated precision-strike technologies” like drones. Philip Alston, The CIA & Targeted Killings Beyond Borders, 2 Hakv. Nat’l Sec. J. 283, 441 (2011). Yet the political question doctrine insures that effective supervision of this wondrous new warfare will not be provided by U.S. courts.
In other liberal democracies, courts play (or seem to play) a significant supervisory role in policing exercises of executive power. See Kristen E. Eichensehr, Comment, On Target? The Israeli Supreme Court & the Expansion of Targeted Killings, 116 Yale L.J. 1873, 1873 (2007) (noting the Israeli Supreme Court had authored the “world’s first judicial decision on targeted killings,” holding “terrorists are civilians under the law of armed conflict and thus are lawfully subject to attack only when they directly participate in hostilities”). In this country, however, strict standing requirements, the political question doctrine, and the state secrets privilege confer such deference to the Executive in the foreign relations arena that the Judiciary has no part to play. These doctrines may be deeply flawed. In fact, I suspect that technology has rendered them largely obsolete, but the Judiciary is simply not equipped to respond nimbly to a reality that is changing daily if not hourly.
I.
In November 2001, the United States launched its first armed drone strike in *251 Afghanistan, targeting Mullah Akhund, the Taliban’s number three in command; the attack missed him but killed several others. Michael C. Horowitz et al., Separating Fact from Fiction in the Debate Over Drone Proliferation, 41 Int’l Security 7, 7 (2016). The following year, the United States conducted a drone strike in Yemen targeting Qa’id Salim Sinan al Harithi, an al-Qaeda operative suspected of plotting the attack against the U.S.S. Cole in 2000. Id. Thereafter, the strikes grew both in number and geographic scope, “extending to Pakistan in 2004 and Somalia in 2007,” for a total of approximately 50 counterterrorism strikes during the Bush Administration. Id. In July 2016, the Obama Administration reported 473 counterterrorism strikes against terrorist targets outside areas of active hostilities — largely consisting of missiles launched from drones — had killed between 2,372 and 2,581 members of terrorist groups as well as 64 to 116 non-combatants. Office of the Dir. of Nat’l Intelligence, Summary of Information Regarding U.S. Counterterrorism Strikes Outside Areas of Active Hostilities 1 (July 1, 2016), available at https://www.dni.gov/files/documents/ Newsroom/Press% 20Releases/DNI + Release + on + CT+Strikes + Outside+Areas + of+Active + Hostilities.PDF (reporting figures for the period beginning January 20, 2009 and ending December 31, 2015). Even the government acknowledges the “inherent limitations” in its ability to calculate the precise effect of these strikes, and it admits the number of non-combatant deaths could be closer to 900. Id. at 2. Non-governmental sources offer substantially higher estimates. See Br. for Brandon Bryant, et al. as Amici Curiae Supporting Appellants 7 (“Serving in the Air Force, amici witnessed widespread and deliberate misclassification of deaths as ‘enemy kills.’ In situations where targets were unknown, they were often classified as ‘enemy kills.’ ”); Daniel Byman, Why Drones Work: The Case for Washington’s Weapon of Choice, 92 Foreign Affairs 32, 35-36 (2013) (citing studies).
More recently, the drone program — run jointly by the Central Intelligence Agency (“CIA”) and the Joint Special Operations Command (“JSOC”) at the Department of Defense — has expanded to include “signature strikes,” such as the one that allegedly killed Salem and Waleed, where the government targets anonymous suspected militants solely based on their observed pattern of behavior. Id. at 36. This practice does not- confine targets to high-level al-Qaeda operatives, and the targets of the strikes are often unknown to U.S. intelligence. Rather, signature strikes target unidentified individuals based on where they live, who they associate with, and whether they engage in behavior commonly associated with militants. Indeed, even after a signature strike is complete, the government still does not know “the precise identities of who [was] killed.” Dan de Luce & Paul McLeary, Obama’s Most Dangerous Drone Tactic Is Here To Stay, Foreign Pol’y (Apr. 5, 2016), http://foreignpolicy. com/2016/04/05/obamas-most-dangerous-drone-tactic-is-here-to-stay/.
Drones are an unquestionably effective way to wage war against geographically-isolated targets. In addition to providing unparalleled levels of surveillance, they have killed many al-Qaeda leaders, denied sanctuary to terrorist groups, and encumbered communication among those seeking to plot attacks. All this at low financial cost, zero risk of harm to U.S. forces, and “fewer civilian casualties than many alter *252 native methods.” Byman, supra, at 32.[1] On a more sinister note, lethal drone strikes avoid the complexities of dealing with live terrorist prisoners — -judicial review alone requires a costly trial, complete with due process protections, followed by prospects for protracted appeal and habeas attempts. See id. at 34 (“It has become more politically palatable for the United States to kill rather than detain suspected terrorists.”). One commentator went so far as to say the Executive has “adopted a de facto ‘kill not capture’ policy” when confronting the terrorist threat. David Rohde, The Obama Doctrine, 192 Foreign Pol’y 64, 68 (2012). One thing is clear: the current generation of drone technology presents political and operational advantages that, all else equal, encourages the use of military force. Horowitz, supra, at 22.
II.
Eb-Shifa Pharmaceutical Industries Co. v. United States, 607 F.3d 836 (D.C. Cir. 2010) (en banc), sensibly holds that a court should not second-guess an Executive’s decision about the appropriate military response — avoiding the need for boots on the ground, for example — to address a singular threat that might occur once or twice at widely separated intervals. Its doctrine, however, seems a wholly inadequate response to an executive decision — deployed through the CIA/JSOC targeted killing program — implementing a standard operating procedure that will be replicated hundreds if not thousands of times.
Addressing these two markedly different scenarios through a shared legal framework is simply, impossible, and yet it is precisely what our precedent demands. To the extent the military sees itself as merely continuing the war declared on the U.S. by 'other means, the drone program may take the war to the enemy. Thus, anyone who credibly represents a threat can be targeted, and, as when armies actually clash, a certain amount of collateral damage is inevitable. See id. On the other hand, CIA/JSOC signature strike activities are covert (at least until the missile finds its target) and intended to develop intelligence that allows the U.S. to anticipate threats to interests at home and abroad. The rules of that game are tacitly assumed to be unknown. Courts are ill-equipped “to assess the nature of battlefield decisions” or “to define the standard for the government’s use of covert operations in conjunction with political turmoil in another country.” Al-Aulaqi v. Obama, 727 F.Supp.2d 1, 46 (D.D.C. 2010).
Of course, this begs the question: if judges will not check this outsized power, then who will? No high-minded appeal to departmentalism, arguing “each [branch] must in the exercise of its functions be guided by the text of the Constitution according to [that branch’s] own interpretation of it,” E. Burns, James Madison: Philosopher of the Constitution 187 (reprinted 1968), changes the fact that every other branch of government seems to be passing the buck. The President is the most equipped to police his own house. See generally Ajkhil Reed Amar, American’s Constitution: A Biography 60-63 (2005) (discussing the President’s independent obligation to ensure his ac *253 tions comply with the Constitution). But, despite an impressive number of executive oversight bodies, there is pitifully little oversight within the Executive. Presidents are slow to appoint members to these boards; their operations are shrouded in secrecy; and it often seems the boards are more interested in protecting and excusing the actions of agencies than holding them accountable. Congress, perhaps? See generally Frank H. Easterbrook, Presidential Review, 40 CASE W. RES. L. REV. 905, 912 (1990) (“If Congress enacts a War Powers Act and the President goes his merry way in reliance on a more expansive view of executive power (and a stingy view of legislative power), Congress need not give up.”). But congressional oversight is a joke — and a bad one at that. Anyone who has watched the zeal with which politicians of one party go after the lawyers and advisors of the opposite party following a change of administration can understand why neither the military nor the intelligence agencies puts any trust in congressional oversight committees. They are too big. They complain bitterly that briefings are not sufficiently in-depth to aid them in making good decisions, but when they receive detailed information, they all too often leak like a sieve.
Our democracy is broken. We must, however, hope that it is not incurably so. This nation’s reputation for open and measured action is our national birthright; it is a history that ensures our credibility in the international community. The spread of drones cannot be stopped, but the U.S. can still influence how they are used in the global community — including, someday, seeking recourse should our enemies turn these powerful weapons 180 degrees to target our homeland. The Executive and Congress must establish a clear policy for drone strikes and precise avenues for accountability.
Civilizational peril comes in many forms — sometimes malevolent philosophies, sometimes hostis humanis generis (pirates, slavers, and now terrorists), and in each epoch we must decide, like Thomas More in Robert Bolt’s A Man for All Seasons, what must be preserved:
ROPER: So now you’d give the Devil benefit of law!
MORE: Yes! What would you do? Cut a great road through the law to get after the Devil?
ROPER: I’d cut down every law in England to do that!
MORE: Oh? And when the last law was down, and the Devil turned round on you — where would you hide, Roper, the laws all being flat? This country’s planted thick with laws from coast to coast — man’s laws, not God’s — and if you cut them down — and you’re just the man to do it — d’you really think you could stand upright in the winds that would blow then? Yes, I’d give the Devil benefit of law, for my own safety’s sake.
Robert Bolt, A Man for All Seasons 37-38 (1960). The Court’s opinion has not hacked down any laws, though we concede the spindly forest encompassing the political question doctrine provides poor shelter in this gale. But it is all a Judiciary bound by precedent and constitutional constraints may permissibly claim. It is up to others to take it from here.

. Perhaps unsurprisingly, the drone program’s push-button war is politically popular. In 2015, the most recent survey results available, 58% of Americans approved of U.S. drone strikes, and only 35% disapproved. Public Continues To Back U.S. Drone Attacks, Pew Research Ctr. (May 28, 2015), http:// www.people-press.org/2015/05/28/public-continues-to-back-u-s-drone-attacks/. The study further found 48% of Americans were very concerned drone strikes could endanger lives of innocent civilians and only 29% were very concerned about whether the strikes were being conducted legally. Id.